# *EXHIBIT "1"*

IN THE CIRCUIT COURT FOR THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

RANEE BARTOLACCI, an individual,

          Plaintiff,

v.

YH LEX ESTATES LLC, a New York limited Liability company,

          Defendant,

and

EZL 40 Meadow Lane LLC, a Delaware limited liability company,

          Nominal Defendant.

_____/

CASE NO. 2021-025805-CA-01 (08)

     Plaintiff Ranee Bartolacci ("Bartolacci") sues Defendant YH Lex Estates LLC ("Defendant" or "YH Lex") and Nominal Defendant EZL 40 Meadow Lane LLC ("EZL"), and alleges as follows:

## **INTRODUCTION**

1.    This action seeks a judgment declaring Bartolacci the rightful 95% owner of EZL.

2.    YH Lex is presently seeking to deprive Bartolacci of her ownership interest in EZL in a judgment enforcement proceeding currently pending against her husband, judgment-debtor Nir Meir ("Meir") in New York.

3.    YH Lex has moved for an order requiring Meir to turnover 100% of the membership interests of EZL in satisfaction of a judgment entered against Meir.

4.    However, as evidenced by the operative EZL operating agreement, EZL is 95% owned by Bartolacci and only 5% owned by Meir.

5.      Most significantly, Bartolacci is a non-judgment-debtor and non-party to the action pending in New York.

6.      YH Lex is presently seeking to deprive Bartolacci of her interest in EZL without affording her notice and an opportunity to be heard.

7.      Bartolacci, a Florida resident, submits that the New York court lacks personal jurisdiction over her to take any action to deprive her of her 95% membership interest in EZL which would be a clear violation of her due process rights.

8.      Thus, notwithstanding the pendency of the action in New York, the issue of Bartolacci's ownership will remain in controversy and YH Lex will undoubtedly continue to attempt to deprive Bartolacci of her interest in EZL.

9.      Therefore, Bartolacci respectfully requests that this Court enter judgment declaring Bartolacci the lawful 95% owner of EZL.

**THE PARTIES**

10.      Plaintiff Bartolacci is an individual who resides in Miami, Florida.

11.      Defendant YH Lex is a limited liability company formed under the laws of the State of New York.

12.      Nominal Defendant EZL is a limited liability company formed under the laws of the State of Delaware.

13.      Venue is proper in this Court because Bartolacci resides in this County and the property interests at issue are located in this County.

**THE PRESENT DISPUTE**

14.      Bartolacci is the 95% owner of EZL.  Meir is the owner of the remaining 5%.

15. On June 15, 2021, the Supreme Court of the State of New York entered judgment against Meir in the approximate amount of $19 million.

16. As part of YH Lex's subsequent judgment enforcement efforts in that action (the "New York Action"), YH Lex filed a motion against Meir for an order compelling him to turn over 100% of the membership interests in EZL.

17. However, as evidenced by the operative EZL operating agreement (attached hereto as Exhibit A), Meir is only a 5% owner of EZL and Bartolacci is the owner of the remaining 95%.

18. Bartolacci is not a party to the New York Action.

19. Bartolacci is not subject to the personal jurisdiction of the New York courts.

20. In accord with the above, Meir asserted, among other things, in the New York Action that he is only a 5% owner of EZL and that the remaining 95% interest in EZL is owned by Bartolacci.

21. Meir argued that Bartolacci was not subject to the personal jurisdiction of the New York court.

22. Meir further argued that, under New York law and fundamental notions of constitutional due process, any determination of the ownership of EZL may only be made after affording Bartolacci notice and an opportunity to be heard by a court having personal jurisdiction over her.

23. In response, YH Lex has asserted that Meir is "in reality" the "true" 100% owner of EZL, that the operative EZL operating agreement is a "sham," and has argued that the New York court should determine the ownership of EZL without affording Bartolacci notice and an opportunity to be heard.

24.     Bartolacci submits that the New York court lacks personal jurisdiction over her and is not empowered to take any action affecting her property interests or otherwise deprive her of her 95% interest in EZL.

25.     Thus, notwithstanding the pending New York Action, YH Lex will certainly continue its efforts to compel Meir to turnover 100% of EZL (and effectively divest Bartolacci of her 95% ownership interest).

## COUNT I – DECLARATORY JUDGMENT

26.     Bartolacci reaffirms and realleges the allegations contained in paragraphs 1-25.

27.     As set forth above, there is a bona fide dispute between the parties concerning the ownership of EZL.

28.     Bartolacci's asserted 95% interest in EZL is disputed by YH Lex who is presently seeking to deprive Bartolacci of that interest.

29.     The present controversy involves the existence or nonexistence of Bartolacci's ownership rights in EZL.

30.     The present controversy involves facts upon which the existence or nonexistence of Bartolacci's 95% ownership rights in EZL do or may depend.

31.     Therefore, there is a bona fide, actual and present need for a judicial declaration that Bartolacci is the 95% owner of EAM.

32.     Bartolacci has named all antagonistic parties.

33.     The relief sought herein is not merely giving of legal advice or the answer to questions propounded for curiosity.

WHEREFORE, Bartolacci demands a judgment against YH Lex declaring that Bartolacci is the 95% owner of EZL, for an award of costs and attorney's fees, and for such other relief as the Court deems just and proper.

VINCENT F. VACCARELLA, P.A.
*Attorneys for Plaintiff*
888 East Las Olas Blvd.
Suite 700
Fort Lauderdale, FL 33301
Office: 305-932-4044


 *John A. Moore*
JOHN A. MOORE
Florida Bar No.: 91820
jmoore@v-law.net

5

# EXHIBIT A

OPERATING AGREEMENT FOR EZL 40 MEADOW LANE LLC
a Delaware Limited Liability Company

This OPERATING AGREEMENT (together with the schedules and exhibits attached hereto, this "Agreement"), dated as of March 21, 2019, by and among EZL 40 MEADOW LANE LLC (the "Company") and the undersigned members (individually, a "Member," and, collectively, the "Members").  Capitalized terms used in this Agreement and not otherwise defined shall have the meanings ascribed to such terms in Article I.

WHEREAS, the Company was formed as a limited liability company under the laws of the State of Delaware by the filing of its Certificate of Formation (as amended, modified, restated or supplemented from time to time, the "Certificate") with the Secretary of State of the State of Delaware and the Members hereby adopt and ratify the Certificate and all acts taken by the sole organizer in connection therewith; and

WHEREAS, the parties hereto wish to set forth their respective rights and obligations to and among each other with respect to the operation of the Company.

NOW, THEREFORE, for and in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the adequacy, receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows.

ARTICLE I
DEFINITIONS

1.1    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Act" means the Delaware Limited Liability Company Act, as amended from time to time (or any corresponding provisions of succeeding law).

"Affiliate" of a Person means any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with such Person.

"Agreement" means this Operating Agreement of the Company, as hereafter amended, modified, restated or supplemented from time to time, and the terms "hereof," "hereto," "hereby," and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

"Base Value" has the meaning ascribed to such term in Section 6.1(d)(i).

"Book Value" shall mean as follows:

(i)    The Book Value of any property contributed by a Member to the Company or acquired by the Company initially shall be the gross fair market value of the property.

(ii)    The Book Value of all Company property shall be adjusted to equal the respective gross fair market values of the property as of the following times, unless the Managing

Member determines that such adjustment is not necessary to reflect the economic arrangement among the Members: (A) the acquisition of an additional Membership Interest by any new or existing Member in exchange for services or more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of cash or property as consideration for a Membership Interest; or (C) the liquidation of the Company within the meaning of Tax Regulations Section 1.704-1(b)(2)(ii)(g), but not a termination of the Company under Section 708(b)(1)(B) of the Code.  If any property is distributed to a Member, the Book Value of such property shall be adjusted to equal the gross fair market value of such property immediately before such distribution.

(iii)    The Book Values of Company property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Tax Regulations Section 1.704-1(b)(2)(iv)(m).

(iv)    The Book Value of Company property shall be adjusted by the depreciation taken into account with respect to such property.

"Capital Account" means, with respect to any Member, the capital account which the Company establishes and maintains for such Member pursuant to Section 3.4.

"Capital Contribution" means the total value of cash and fair market value of property or services or other consideration contributed to the Company from time to time by Members as reflected on Schedule A hereto, as amended from time to time.

"Certificate" has the meaning ascribed to such term in the preamble to this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Regulations.

"Company" has the meaning ascribed to such term in the preamble to this Agreement.

"Company Minimum Gain" has the meaning ascribed to the term "Partnership Minimum Gain" in the Regulations Section 1.704-2(d).

"Covered Person" and "Covered Persons" have the meanings ascribed to such terms in Section 11.1.

"Damages" has the meaning ascribed to such term in Section 11.2.

"Distributable Cash" means the amount of cash which the Manager, in his sole and absolute discretion, deems available for distribution to the Members, taking into account (a) payment of all Company debts, liabilities, expenses and obligations then incurred, including debts, liabilities, expenses, fees, and obligations to the Members or the Manager, and (b) amounts which the Manager, in his sole and absolute discretion, deems necessary for reserves for the Company's future needs, but excluding Net Sale Proceeds (which shall be distributed in accordance with Section 10.5).

"Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

"Indemnified Person" and "Indemnified Persons" have the meanings ascribed to such terms in Section 11.2.

"Manager" means the Person or Persons selected to manage the affairs of the Company as provided under Article V.

"Member" means each Person who (a) is an initial signatory to this Agreement, has been admitted to the Company as a Member in accordance with the Certificate or this Agreement or is an assignee who has become a Member in accordance with Article VII, and (b) has not resigned, withdrawn, been expelled or, if other than an individual, dissolved.

"Member Nonrecourse Debt" has the meaning ascribed to the term "Partner Nonrecourse Debt" in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" has the meaning ascribed to the term "Partner Nonrecourse Deductions" in Regulations Section 1.704-2(c).

"Membership Interest" and "Membership Interests" have the meaning ascribed to such term in Section 3.2.

"Net Profits" and "Net Losses" means the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, under the method of accounting at the close of each Fiscal Year on the Company's information tax return filed for federal income tax purposes. Net Profits and Net Losses are to be allocated as provided in Article VI.

"Net Sale Proceeds" means the net proceeds of sale (after payments of all expenses attributable thereto) of all or substantially all of the Company's assets.

"Nir" means Nir Meir, an individual.

"Percentage Interest" has the meaning ascribed to such term in Section 3.2.

"Person" means an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust, association or any other entity.

"Regulations" means, unless the context clearly indicates otherwise, the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

"Restructuring" has the meaning ascribed to such term in Section 13.2(a).

"Securities Act" means the Securities Act of 1933, as amended.

"Tax Distribution" has the meaning ascribed to such term in Section 6.4.

"Transfer" has the meaning ascribed to such term in Section 7.1.

"Unit" has the meaning ascribed to such term in Section 3.2.

"Unreturned Capital Contributions Account" means, with respect to any Member that has made a Capital Contribution from time to time, a bookkeeping account which shall at all times be equal to the Capital Contributions, if any, made by such Member, reduced by the distributions, if any, made to such Member pursuant to Section 6.5(a).

1.2     Interpretation.  For the avoidance of doubt in construing this Agreement, unless the context in which words are used herein expresses a contrary meaning or intent, (a) words that are singular in number shall include the plural and vice versa, (b) pronouns in the masculine, feminine and neuter genders shall each be deemed to include all genders, (c) the words "herein," "hereof," and "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular subdivision of this Agreement, and (d) the word "including" shall be deemed to be followed by the words "without limitation."

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1     Formation.  Pursuant to the Act the Manager previously caused the formation of a Delaware limited liability company under the laws of the State of Delaware by filing the Certificate with the Department of State of the State of Delaware.  The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     Name.  The name of the Company is "EZL 40 Meadow Lane LLC."  The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable.  The Manager shall cause to be filed any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable.

2.3     Term.  The term of the Company commenced on the filing of the Certificate with the Secretary of State of the State of Delaware and shall continue in existence in perpetuity until the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Agreement.  The Manager is hereby authorized to execute and file such documents as they determine are necessary or appropriate, including an amendment to the Certificate, to effectuate the foregoing.

2.4     Purpose of Company.  The Company's purpose is to engage in any lawful business or activities as are permitted under the Act or in any other jurisdiction in which the Company conducts business.  The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as described herein.

2.5     Office and Agent.  The Company shall continuously maintain a registered agent in the State of Delaware.  The principal office of the Company shall be at such location as the

Manager may determine from time to time. The Company also may have such other offices as the Manager from time to time may determine, or the business of the Company may require. The registered agent shall be as stated in the Certificate or as otherwise determined by the Manager.

2.6     <u>Addresses of the Members</u>.  The respective addresses of the Members for notice purposes are set forth on <u>Schedule A</u>.  The address for any Member shall be changed upon the request of such Member, and, upon such request, the Manager shall update <u>Schedule A</u> accordingly.

2.7     <u>Reservation of Other Business Opportunities</u>.  No business opportunities other than those actually exploited by the Company shall be deemed to be the property of the Company, and any Member (or Manager) may engage in, or possess an interest in, any other business venture (including those which may be competitive with the Company), independently or with others of any nature and description, and neither any other Member nor the Company shall have any rights by virtue hereof in and to such other business ventures, or to the income or profits derived therefrom.

ARTICLE III
CAPITAL CONTRIBUTIONS AND CAPITAL STRUCTURE

3.1     <u>Capital Contributions</u>.  The initial Capital Contribution of each Member is as set forth on <u>Schedule A</u>.  <u>Schedule A</u> shall be revised by the Manager to reflect any additional Capital Contributions from time to time or other changes in the membership (including with respect to Units and Percentage Interests) of the Company.  Members shall not be entitled to a return of their Capital Contribution or to receive any interest on such Capital Contributions except as otherwise expressly set forth herein.

3.2     <u>Units; Vesting of Certain Units; Membership Interest; Percentage Interest</u>.

(a)     Each Member's interest in the Company, including, without limitation, (a) the right of a Member to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under this Agreement, and (b) to the extent expressly set forth herein, any management rights, voting rights, rights to consent, and the right to information concerning the business and affairs of the Company, as provided in this Agreement and under the Act are referred to herein individually as a "<u>Membership Interest</u>," and collectively as "<u>Membership Interests</u>."  Each Member's Membership Interest shall be represented by units of limited liability company interest (each, a "<u>Unit</u>").  The ownership by a Member of Units shall entitle such Member to allocations of Net Profits and Net Losses and other items and distributions of cash and other property as set forth in this Agreement.  The Company is authorized to issue an unlimited number of Units in different classes and Units shall be issued in non-certificate form. The percentage of each Member's Membership Interest at any time shall be determined by dividing the number of Units owned by such Member at such time by the total number of Units then issued and outstanding, and shall be referred to as a Member's "<u>Percentage Interest</u>."  The number of Units held by each Member and the Percentage Interest of each Member shall be as set forth on <u>Schedule A</u>, which shall be amended from time to time by the Manager as required to reflect the issuance of additional Units, the reduction in any Member's Units, the Transfer or redemption of Units, the applicable Percentage Interests of the Members, and the addition or withdrawal of Members.

3.3    <u>No Additional Capital Contributions</u>.  The Members shall not be required to contribute any additional capital to the Company.

3.4    <u>Capital Accounts</u>.  The Company shall establish an individual Capital Account for each Member.  The Company shall determine and maintain each Capital Account in accordance with Regulations Section 1.704-1(b)(2)(iv).  If a Member transfers all or a part of such Member's Units in accordance with this Agreement, such Member's Capital Account attributable to the transferred Units shall carry over to the new owner of such Units pursuant to Regulations Section 1.704-1(b)(2)(iv)(l). A Member shall not be entitled to withdraw any part of such Member's Capital Account or to receive any distributions from the Company, except as specifically provided in this Agreement.

3.5    <u>Resignation/Withdrawal</u>.  A Member may not resign or withdraw from the Company except with the consent of the Manager, which consent may be withheld by the Manager in his sole and absolute discretion.

3.6    <u>Dilution</u>.  In the event that the Company issues additional Units to an existing Member or Members, or admits an additional Member or Members, then the respective Percentage Interest of each Member who does not participate in his pro rata amount of any such issuance shall be diluted by the issuance of such additional Units, and <u>Schedule A</u> shall be amended by the Manager accordingly.

ARTICLE IV<br>MEMBERS

4.1    <u>Limited Liability</u>.  Except as required under the Act or as expressly set forth in this Agreement, no Member or Manager shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise by reason of being a Member.

4.2    <u>Admission of Additional Members</u>.  The issuance of additional Units and/or the admittance of additional Members, for such consideration and on such terms and conditions as shall be determined by the Manager, shall be permitted upon the election of the Manager, including in consideration for Services.  Any such additional Members shall obtain Units and will participate in the management, Net Profits, Net Losses, and Distributable Cash of the Company as determined by the Manager.

4.3    <u>Power to Bind the Company</u>.  No Member (other than a Manager) shall have any authority to bind the Company with respect to any matter except pursuant to a resolution expressly authorizing such action, which resolution is duly adopted by the Manager.

4.4    <u>Meetings of and Voting by Members</u>.  No annual or regular meetings of the Members shall be required.  A meeting of the Members may be called at any time by a Manager or the Member(s).  Meetings of Members shall be held at the Company's principal place of business or at any other place within the State of New York agreed to by the Manager and, if a Member or Members called the meeting, such Members.  Not less than five nor more than 30 days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting.  The notice shall state the place, date, hour, and

6

purpose of the meeting.  Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy without objecting to the lack of notice.  Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding at least a majority of the Units constitutes a quorum.  A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney in fact.  A Member may also participate in any meeting telephonically so long as all Members can hear each other at the same time.  Any action that may be taken at a meeting of Members may be taken without a meeting, if a consent in writing setting forth the action so taken, is signed and delivered to the Company by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to vote on that action at a meeting were present and voted.  All such consents shall be filed with the Company and, in any event, shall be maintained in the Company records.  If an action is authorized by written consent, no meeting of the Members need be called or notice be given.  A copy of any action taken by written consent shall be sent promptly to all Members.

4.5     No Voting Rights.  No Member (in his, her or its capacity as a Member) shall have any voting rights or management rights whatsoever, including, without limitation, with respect to the merger, consolidation or conversion of the Company, except as expressly provided in this Agreement or as may be required by an unwaivable provision of the Act.

4.6     Member Loans.  In the event that the Manager determines in good faith that the Company requires additional funds, the Manager may, or may permit the Members to, lend funds to the Company at interest rates and upon such other terms as determined by the Manager.  Unless otherwise determined by the Manager, any such Manager or Member loans shall be repaid by the Company on a pari passu basis prior to the distribution of Distributable Cash.  Loans by a Member to the Company shall not be considered Capital Contributions.

ARTICLE V
MANAGEMENT AND CONTROL OF THE COMPANY

5.1     Management of the Company by the Manages.   Subject only to the express limitations set forth in this Agreement, the right to manage, control and conduct the business and affairs of the Company and to take any and all actions on behalf of the Company shall be vested exclusively in the Manager, who shall manage the Company solely in his capacity as the Manager of the Company, and who shall have all necessary powers to manage and carry out the purposes, business, property and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in the Act.  The number of Managers shall initially be one; provided, the Manager may increase the number of Managers, in his sole discretion.  The Members hereby designate Nir as the Manager.  If the Manager shall resign or become unable to serve as Manager, a successor Manager will be elected by the Members holding a majority of the Percentage Interests.  A Manager may not be removed as a Manager without such Manager's consent.  A Manager is not required to be a Member of the Company.  The Manager shall have full, complete and exclusive authority, power and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the

7

management of the Company's business, property and affairs.  The Manager shall have the right to execute documents on behalf of the Company and to otherwise bind the Company on all matters determined by the Manager.  Decisions made by the Manager in accordance with the terms and conditions of this Agreement may be implemented through any Person selected by the Manager.

5.2     Powers of the Manager.  Subject to the express limitations set forth in this Agreement, the Manager shall have all necessary powers to manage and carry out the purposes, business, property, and affairs of the Company, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in the Act.  Without in any way limiting the foregoing, or the provisions of Section 5.1, the Manager shall have the authority, without the need to obtain the consent of any Member, to:  (a) consummate any sale, reorganization, merger or consolidation of the Company with or into any other Person or any other business combination; (b) sell all or any portion of the assets of the Company; (c) acquire all or substantially all or any of the assets or equity of any other company or business; (d) incur indebtedness; (e) grant a lien on any of the Company's assets; (f) issue additional Units (or options or rights to acquire Units) to new or existing Members and admit additional Members; (g) redeem Units held by any Member or Assignee; (h) commence, defend or settle any litigation or other proceeding; (i) convert the Company to a corporation, and (j) file a petition for the voluntary bankruptcy, dissolution or liquidation of the Company.

5.3     Performance of Duties; Liability of Manager.

(a)     The Manager shall only be required to devote such time, attention, skill and energy to the business and affairs of the Company in his capacity as Manager as he believes is reasonably necessary for him to properly perform his obligations as Manager.

(b)     To the extent permitted by applicable law, the Manager shall have no liability for breach of contract and breach of duties (including fiduciary duties) to the Company or to another Member or to another Person that is a party to or is otherwise bound by this Agreement, provided, that this provision shall not limit or eliminate a Manager's liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.  Without limiting the foregoing, a Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been determined by a court of law or arbitrator, as applicable, not subject to further appeal to have been the result of such Manager's fraud, bad faith, or willful misconduct.  In exercising the rights of a Manager, the Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, provided by the officers, employees or other agents of the Company or any attorney, independent accountant or other professional.

5.4     Acts of Manager as Conclusive Evidence of Authority.  Third parties shall be permitted to rely on any note, mortgage, evidence of indebtedness, contract, certificate, statement, conveyance, instrument or other document in writing, and any assignment or endorsement thereof, executed or entered into between the Company and any other Person, when signed by a Manager.

5.5     Officers and Employees.  The Manager may appoint or engage such Persons as the Manages shall determine as officers or employees of the Company, and such officers or employees shall have such duties as may be approved by the Manager.  The officers and employees of the

8

Company shall serve subject to the direction of the Manager. The Manager shall determine the compensation (including base salary, bonus, and benefits) payable to each officer and employee of the Company; such compensation shall be reasonably commensurate with the duties and responsibilities of such officers and employees in the reasonable discretion of the Manager. The Manager may remove any officer or employee at any time.

     5.6     <u>Limited Liability</u>. Neither any Manager, nor any Person who is an officer or employee of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether the liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager, officer or employee of the Company.

     5.7     <u>Reimbursement of Manager</u>. The Manager shall be reimbursed for all out-of-pocket expenses, disbursements and advances incurred or made by the Manager in connection with the management, operation or business of the Company, including, without limitation, fees for outside services, accounting expenses, reasonable travel and entertainment expenses, insurance premiums, legal fees, taxes or other governmental charges, expenses relating to the business of the Company, and other direct or indirect costs, upon submission to the Company of reasonably detailed evidence of such expenditures. Any out-of-pocket expenditure made by a Manager and eligible for reimbursement pursuant to this Section 5.7 shall not be treated as a Capital Contribution and any reimbursement of such expenditure shall not be treated as a distribution to such Manager.

ARTICLE VI<br>ALLOCATIONS OF NET PROFITS<br>AND NET LOSSES AND DISTRIBUTIONS

     6.1     <u>Allocations of Net Profits and Net Losses</u>.

     (a)     After taking into account any special allocations pursuant to Section 6.2 and subject to any limitations contained therein, Net Profits or Losses for any Fiscal Year or portion thereof shall be allocated amount the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions that would be made to such Member if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability), and the net assets of the Company were distributed in accordance with Section 10.5(c) to the Members immediately after making such allocation.

     (d)     As indicated in Section 3.2(b), it is the intent of the Members and the Company that any Profits Interest Units that may be issued shall be classified and treated for tax purposes as a "profits interest" (and not a "capital interest") within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343, as clarified by Revenue Procedure 2001-43, 2001-2 C.B. 191, or any successor authority thereto. It is the further intent of the Members and the Company that, to the extent any Profits Interest Units are outstanding, all allocations of Net Profits and Net Losses and distributions shall be made in accordance with the provisions of Revenue Procedure 93-27, 1993-2 C.B. 343, as clarified by Revenue Procedure 2001-43, 2001-2 C.B. 191, or any successor authority thereto. Accordingly, in the sole and unreviewable discretion of the Manager and

9

without amendment to this Agreement, notwithstanding anything contained herein to the contrary, Section 6.1, Section 6.5 and Section 10.5 shall be interpreted and enforced in accordance with the following:

    (i)    Upon the sale of all or substantially all of the assets of the Company or liquidation of the Company, a holder of Profits Interest Units shall only be entitled to share in the net proceeds thereof to the extent such net proceeds exceed the value of the Company as of the date of issuance of any such Profits Interest Units (the "Base Value") (e.g., upon the deemed sale of all or substantially all of the assets of the Company or liquidation of the Company on the date of issuance of Profits Sharing Units, the entire net proceeds thereof shall be distributed to those Members of the Company who were Members immediately prior to the issuance of the Profits Interests Units).

    (ii)    The Base Value shall be determined from time to time in the sole unreviewable discretion of the Manager.

    (iii)    All Net Profits and Net Losses of the Company shall be allocated in such manner to give substantial economic effect to such allocations reflecting the amount of distributions to be made to the Members consistent with the provisions of this Section (e.g., any unrealized Net Profits and Net Losses attributable to assets of the Company existing as of the date of issuance of Profits Interest Units shall be allocated to those Members of the Company who were Members immediately prior to the issuance of the Profits Interests Units).

6.2    <u>Special Allocations</u>.

    (a)    Notwithstanding Section 6.1, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years), in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 6.2(a) shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2(a). The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f). This Section 6.2(a) is intended to comply with the minimum gain chargeback requirement contained in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

    (b)    Notwithstanding Section 6.1 of this Agreement, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt, during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations Section 1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's

share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 6.2(b) shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.2(b). The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4). This Section 6.2(b) is intended to comply with the minimum gain charge-back requirement contained in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Notwithstanding Section 6.1, any nonrecourse deductions (as defined in Regulations Section 1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

(d)     Notwithstanding Section 6.1, those items of Company loss, deduction, or Code Section 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Regulations Section 1.704-2(i).

(e)     Notwithstanding Section 6.1, if a Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (b), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.2(e) shall be taken into account in computing subsequent allocations of income and gain pursuant to this Article VI so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this Article VI to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 6.2(e) if such unexpected adjustments, allocations, or distributions had not occurred.

6.3     Code Section 704(c) Allocations. Notwithstanding any other provision in this Article VI, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this Section 6.3 are solely for purposes of federal, state and local taxes. As such, they shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

6.4     Tax Distributions. With respect to each taxable year and portion thereof in which the Company is taxed as a partnership for U.S. federal income tax purposes, the Manager shall cause the Company, within 90 days of the end of each Fiscal Year other than the year in which the Company liquidates, to distribute to the Members in proportion to the Net Profits allocated to the Members an aggregate amount (a "Tax Distribution") that will provide to each Member an amount

equal to at least 40% of the Net Profits allocated to that Member for such year, less any amounts previously distributed to the Members with respect to such fiscal year pursuant to Section 6.5. Distributions under this Section 6.4 shall only be made from Distributable Cash and only to the extent funds are legally or otherwise available therefor in the discretion of the Manager and would not result in the Company's breach of any obligation.  All distributions to a Member under this Section 6.4 shall take priority over and shall reduce the amount of distributions otherwise to be made after that date to that Member under Section 6.5 by the same amount.

6.5    Distributions of Distributable Cash by the Company.  Subject to applicable law and the provisions of Section 6.1(d), Section 3.3, Section 6.4 and Section 10.5, the Manager shall determine, in his sole and absolute discretion, the amount of Distributable Cash and, from time to time upon such determination, but in no event less frequently than annually, the Company shall distribute to the Members the amount of Distributable Cash so determined in the following order of priority: (a) first, at all times prior to the time that the Unreturned Capital Contributions Account of each Member has been reduced to zero, pro rata to each such Member as the balance of such Member's Unreturned Capital Contributions Account relates to the aggregate balance of Unreturned Capital Contributions Accounts of all the Members; and (b) thereafter, to all Members pro rata in accordance with each Member's respective Percentage Interest.  Neither the Company, the Manager nor any Member shall incur or have any liability (including to the Members or the Company) for making distributions in accordance with Section 6.4, this Section 6.5 or Section 10.5.  Net Sale Proceeds, and proceeds and assets upon liquidation, shall be distributed in accordance with Section 10.5.

6.6    Form of Distribution.  A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand or receive any distribution from the Company in any form other than money except upon the liquidation of the Company in accordance with Article X.  No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members.

6.7    Withholding Taxes.  The Company is authorized to withhold from distributions to a Member, or with respect to allocations to a Member, and to pay over to a federal, state, local or foreign government, any amounts required to be withheld pursuant to the Code, or any provisions of any other federal, state, local or foreign law.  Any amounts so withheld shall be treated as having been distributed to such Member pursuant to this Article VI for all purposes of this Agreement, and shall be offset against the amounts otherwise distributable to such Member.

6.8    Obligations of Members to Report Allocations.  The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their shares of Company income and loss for income tax purposes.

6.9    Negative Capital Account Balances.  No Member shall be required to restore any negative balances in such Member's Capital Account.

## ARTICLE VII
## TRANSFER AND ASSIGNMENT

7.1     General.  Except as set forth in this Agreement, no Member shall gift, sell, assign, pledge, hypothecate, exchange, dispose or otherwise transfer (collectively, a "Transfer") any Units to another Person without the consent of the Manager

7.8     Transfers Not in Compliance Void.  Any attempted Transfer of Units by a Member not in compliance with this Article VII shall be null and void *ab initio* and of no force whatsoever.

## ARTICLE VIII
## Intentionally Omitted

## ARTICLE IX
## BOOKS, REPORTS AND REPORTING

9.1     Books.  The Manager shall cause to be maintained complete and accurate books of account of the Company's affairs at the Company's principal place of business and shall be available for the review of the Members at the offices of the Company during normal business hours and upon reasonable advanced notice, and subject to such other restrictions and requirements as may be imposed by the Manager in accordance with Section 18-305 of the Act.  Such books shall be kept on such method of accounting as the Manager shall select.

9.3     Filings.  The Manager, at the Company's expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities.  The Manager, at the Company's expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules and regulations.  If a Member required by the Act to execute or file any document fails, after demand, to do so within a reasonable period of time or refuses to do so, the Manager may prepare, execute and file such document.

9.4     Designation of Tax Matters Member.  The Members hereby appoint Nir as the "tax matters partner" (as defined in Code Section 6231 prior to its amendment by the Bipartisan Budget Act of 2015 ("BBA")) (the "Tax Matters Member") and the "partnership representative" (the "Partnership Representative") as provided in Code Section 6223(a) (as amended by the BBA). The Tax Matters Member and Partnership Representative are each authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by taxing authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  Each Member agrees that such Member will not independently act with respect to tax audits or tax litigation of the Company, unless previously authorized to do so in writing by the Tax Matters Member or Partnership Representative.   In the event of an audit of the Company that is subject to the partnership audit procedures enacted under Section 1101 of the BBA (the "BBA Procedures"), the Partnership Representative, in its sole and absolute discretion, shall have the right to make any and all elections and to take any actions that are available to be made or taken by the Partnership Representative or the Company under the BBA Procedures. Robins shall not resign as the Tax

13

Matters Member unless, on the effective date of such resignation, the Company has designated another Person as Tax Matters Member and such Person has given its consent in writing to its appointment as Tax Matters Member.  The Tax Matters Member shall receive no additional compensation from the Company for its services in that capacity, but all expenses incurred by the Tax Matters Member in such capacity shall be borne by the Company.  In addition, Nir  shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws

ARTICLE X
DISSOLUTION AND WINDING UP

10.1     Dissolution.  The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:  (a) upon the happening of any event of dissolution specified in the Certificate; (b) upon the entry of a decree of judicial dissolution; (c) the sale of all or substantially all of the assets of Company; or (d) otherwise upon the consent of the Manager.

10.2     Filings.  As soon as possible following the occurrence of any of the events specified in Section 10.1, the Company shall execute, acknowledge and cause to be filed such certificates and other instruments in such form as shall be necessary or appropriate to evidence the dissolution of the Company.

10.3     Winding Up.  Upon the occurrence of any event specified in Section 10.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  The Manager shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the liabilities of the Company and its assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefore, to be applied and distributed as provided in Section 10.5.

10.4     Distributions in Kind.  Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect such allocations.  The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of each interest (net of any liability secured by such asset that such Member assumes or takes subject to).  The fair market value of such asset shall be determined in good faith by the Manager.

10.5     Order of Payment of Liabilities and Distributions Upon Dissolution or Liquidation.  Net Sale Proceeds and all other assets of the Company upon its liquidation shall, subject to Section 6.1(d), be applied and distributed in the following order of priority: (a) first, to the payment of the expenses of liquidation and the debts and liabilities of the Company, including, without limitation, debts and liabilities owing to the Members; (b) second, to the setting up of any reserves which the Manager may deem necessary or desirable for any contingent or unforeseen liabilities or obligations of the Company, which reserves shall be paid over to a title company or an attorney-

14

at-law admitted to practice in the State of Delaware or New York as escrow agent, to be held for a period to be determined by the Manager for the purpose of payment of the aforesaid liabilities and obligations, at the expiration of which period the balance of such reserves shall be distributed as hereinafter provided; (c) third, to the Members in proportion to their respective Capital Accounts until each Member has received cash distribution equal to any positive balance in such Member's Capital Account, in accordance with the rules and requirements of Regulations Section 1.704-1(b)(2)(ii)(b) and after taking into account the allocation of Net Profits, Net Losses, gains or losses pursuant to Article VI; and (d) finally, to the Members in proportion to the Members' Percentage Interests. If the Manager determines that it is not practicable to liquidate all of the assets of the Company, the Manager may retain assets having a fair market value equal to the amount by which the net proceeds of liquidated assets are insufficient to satisfy the debts and liabilities referred to above. If, in the absolute judgment of the Manager, it is not feasible to distribute to each Member his proportionate share of each asset, the Manager may allocate and distribute specific assets to one or more Member in such manner as the Manager shall determine to be fair and equitable, taking into consideration the basis for tax purposes of each asset.

10.6   <u>Limitations on Payments Made in Dissolution</u>.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of his positive Capital Account balance and shall have no recourse for his Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against any Manager or any other Member except as provided in Article XI.

10.7   <u>Termination</u>.  Upon completion of the dissolution, winding up, liquidation and distribution of the assets of the Company, the Company shall be deemed terminated.

ARTICLE XI
<u>EXCULPATION, INDEMNIFICATION AND INSURANCE</u>

11.1   <u>Exculpation</u>.  Notwithstanding any other provisions of this Agreement, whether express or implied, or obligation or duty at law or in equity, neither the Manager nor any of the Members, or any officers, directors, stockholders, partners, employees, representatives, consultants or agents of either of the foregoing, nor any officer, employee, representative, consultant or agent of the Company or any of its Affiliates (individually, a "<u>Covered Person</u>" and, collectively, the "<u>Covered Persons</u>") shall be liable to the Company or any other Person for any act or omission (in relation to the Company and the conduct of its business, the Agreement, any related document or any transaction contemplated hereby or thereby) taken or omitted in good faith by a Covered Person and in the reasonable belief that such act or omission was in or was not contrary to the best interests of the Company; provided that such act or omission does not constitute fraud, willful misconduct or bad faith.

11.2   <u>Indemnification</u>.  To the fullest extent permitted by applicable law, in the event that any Member or Manager or any of their heirs, legal representatives, partners, members, trustees, directors, officers, shareholders, employees, incorporators, agents, Affiliates or controlling persons, successors or assigns (collectively, "<u>Indemnified Persons</u>" and each, including the applicable Member, an "<u>Indemnified Person</u>"), becomes subject to, in any capacity, in any threatened, pending or completed action, proceeding or investigation, in connection with any matter arising out of or relating to the Company's business or affairs, the Company will

15

periodically reimburse such Indemnified Person for its legal and other related expenses incurred in connection therewith, provided, that such Indemnified Person shall promptly repay to the Company the amount of any such reimbursed expenses paid to such Indemnified Person if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company in connection with such action, proceeding or investigation as provided in the exception contained in the next sentence.  To the fullest extent permitted under the law of the State of Delaware as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment), the Company also will indemnify and hold harmless each Indemnified Person against losses, claims, damages, liabilities, obligations, penalties, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature whatsoever (collectively, "Damages"), to which such Indemnified Person may become subject in connection with any matter arising out of or in connection with the Company's business or affairs, except to the extent any such Damages result solely from the fraud, willful misfeasance, gross negligence or bad faith of such Indemnified Person.  The reimbursement and indemnity obligations of the Company under this Section 11.2 shall be in addition to any liability which the Company may otherwise have to any Indemnified Person and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and any Indemnified Person.  The reimbursement and indemnity obligations of the Company under this Section 11.2 shall be limited to the Company's assets, and no Member or Manager shall have any personal liability on account thereof.  Any amendment or repeal of this Section 11.2 shall not adversely affect any right or protection existing hereunder immediately prior to such amendment or repeal.

11.3     Insurance.  The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent, officer, employee, Member or Manager of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 11.2 or under applicable law.

## ARTICLE XII
## AMENDMENT TO AGREEMENT

12.1     Amendments.  Except as otherwise explicitly set forth herein, amendments, modifications, restatements or supplements to this Agreement shall require only the written consent of the Manager.

## ARTICLE XIII
## TRANSACTIONS WITH THE COMPANY; CONVERSION

13.1     Business Transactions with the Company.  The Members, and the Manager, or an Affiliate of any Member or Manager may lend money to, act as surety, guarantor or endorser for, guaranty or assume one or more obligations of, or provide collateral for the Company upon the consent of the Manager.  In addition, the Company may transact business with any Member, Manager or Affiliate of any Member or Manager and such Member, Manager or Affiliate thereof may receive compensation and remuneration therefor, as determined by the Manager; provided, however, that such services are provided on arms-length terms.  No transaction with the Company

16

shall be voidable solely because a Member, Manager or Affiliate of a Member or Manager has a direct or indirect interest in the transaction. Subject to applicable law, any Member, including any Manager, transacting business with the Company shall have the same rights and obligations with respect to any such matter as a Person who is not a Member.

13.2    Conversion.

(a)    The Manager may, in his discretion, cause the conversion of the limited liability company, or any portion thereof, to a corporation, including by (i) the transfer of all of the Company's assets, or the transfer of any portion of such assets and liabilities, to one or more corporations in exchange for shares of such corporation(s) and the subsequent distribution of such shares, at such time as the Manager may determine, to the Members, (ii) conversion of the Company into a corporation pursuant to 6 Del. C. §18-216 (or any successor section thereto) or (iii) Transfer, assignment or other conveyance by each Member of Units held by such Member to one or more corporations in exchange for shares of such corporation(s) (including by merger of the Company into a corporation), (each of (i), (ii) and (iii), a "Restructuring"). The Members shall take all necessary or desirable actions requested by the Manager in connection with the consummation of such Restructuring, including without limitation, consenting to, voting for and waiving any dissenters rights, appraisal rights or similar rights and participating in any exchange or other transaction required in connection with such Restructuring and executing the applicable stockholders' or similar agreement and other documents or agreements required in connection therewith. The Company shall pay any and all organizational, legal and accounting expenses and filing fees incurred in connection with such incorporation transaction. It is the intent of the Members that the conversion or reorganization of the Company into a corporate form is part of the Members' initial investment decision with respect hereto.

(b)    In connection with any Restructuring, any stock, securities or other consideration resulting from such Restructuring of the Company shall be allocated among the Members as if the aggregate amount of each class of stock, securities or other consideration had been distributed by the Company to the Members in complete liquidation pursuant to Article X of this Agreement as in effect immediately prior to such incorporation, recapitalization and/or reorganization in a manner such that each Member shall have an equal percentage of each such class of stock, securities or other consideration so distributed.

(c)    Each Member hereby constitutes and appoints the Manager with full power of substitution, as his, her or its true and lawful agent and attorney-in-fact, with full power and authority in his or its name, place and stead, to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices all certificates, powers, conveyances, agreements and other instruments or documents that the Manager deems appropriate or necessary in connection with a Restructuring as described in this Section 13.2. The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Member and the Transfer of all or any portion of his, her or its Units and shall extend to such Member's heirs, successors, assigns and personal representatives. Any Member that does not comply with the terms and provisions of Section 13.2 shall pay all of the costs and fees, including attorneys' fees, incurred by the Company in connection with enforcing Section 13.2 and/or taking the actions described in this Section 13.2(c).

17

ARTICLE XIV
Intentionally Omitted

ARTICLE XV
MISCELLANEOUS

15.1   Complete Agreement.  This Agreement constitutes the entire agreement among the parties hereto relating to the subject matter hereof and supersedes all prior contracts, agreements and understandings between them.  No course of prior dealings among the parties hereto shall be relevant to supplement or explain any term used in this Agreement.  Acceptance or acquiescence in a course of performance rendered under this Agreement shall not be relevant to determine the meaning of this Agreement even though the accepting or the acquiescing party has knowledge of the nature of the performance and an opportunity for objection.  No provisions of this Agreement may be waived orally, but only by an instrument in writing executed by the waiving party.  No waiver of any terms or conditions of this Agreement in one instance shall operate as a waiver of any other term or condition or as a waiver in any other instance.  No representation, statement, condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

15.3   Binding Effect.   Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

15.4   Parties in Interest.  Except as set forth in Article XI, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective, heirs, administrators, successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

15.5   Pronouns; Statutory References.  All pronouns and all variations thereof shall be deemed to refer to the masculine, feminine, or neuter, singular or plural, as the context in which they are used may require.  Any reference to the Code, the Regulations, the Act, or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

15.6   Headings.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

15.7   Interpretation.  In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

15.8   References to this Agreement.   Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

15.9    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

15.10   JURISDICTION.  SUBJECT TO SECTION 15.17, THE PARTIES HEREBY EXPRESSLY CONSENT AND SUBMIT TO THE EXCLUSIVE VENUE AND PERSONAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK, NEW YORK COUNTY, OR IN THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPROPRIATE APPELLATE COURT THEREOF, FOR THE RESOLUTION OF DISPUTES ARISING HEREUNDER, AND EACH PARTY HEREBY WAIVES ANY DEFENSE OF IMPROPER VENUE OR INCONVENIENT FORUM AS TO ANY ACTION BROUGHT IN SUCH COURTS.  THE COMPANY AND EACH MEMBER FURTHER AGREES THAT PERSONAL JURISDICTION OVER HIM OR IT MAY BE EFFECTUATED BY SERVICE OF PROCESS BY REGISTERED OR CERTIFIED MAIL ADDRESSED AS PROVIDED IN SECTION 15.14 OF THIS AGREEMENT.

15.11   Schedules.  All schedules and exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

15.12   Severability.  If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby and will continue in full force without being impaired or invalidated in any way.  The Members agree to replace any invalid or unenforceable provision with a valid provision that most closely approximates the intent and economic effect of the invalid or unenforceable provision.

15.13   Additional Documents and Acts.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

15.14   Notices.  Unless otherwise specifically provided in this Agreement, all notices and other communications required or permitted to be given hereunder shall be in writing and shall be (a) delivered by hand, (b) delivered by a nationally recognized commercial overnight delivery service, (c) mailed postage prepaid by first class mail, (d) by facsimile, or (e) by electronic mail, in any such case directed or addressed to each Member at the address set forth on Schedule A hereto or the facsimile number or electronic mail address provided by such Member to the Company, and to the Company at its then current address.  Such notices shall be effective: (i) in the case of hand deliveries when received; (ii) in the case of an overnight delivery service, on the next business day after being placed in the possession of such delivery service, with delivery charges prepaid; (iii) in the case of mail, five days after deposit in the postal system, first class mail, postage prepaid, (iv) in the case of facsimile notices, when electronic indication of receipt is received, and (v) in the case of electronic mail, when sent.  Any Member may change its address, facsimile number and electronic mail address by written notice to the Company; upon the receipt of any such notice the Manager shall amend Schedule A consistent with such notice and shall promptly provide such amended Schedule A to the Members in accordance with this Section 15.14.

15.15   <u>No Interest in Company Property; Waiver of Action for Partition</u>.  No Member has any interest in specific property of the Company.  Without limiting the foregoing, each Member irrevocably waives during the term of the Company any right that he or she may have to maintain any action to dissolve the Company or for partition with respect to the property of the Company.

15.16   <u>Representations and Warranties of the Members</u>.  As of the date of each acquisition by such Member of a Membership Interest, each Member represents and warrants to the Company as follows:

(a)      This Agreement constitutes the legal, valid and binding obligation of such Member enforceable in accordance with its terms.

(b)      No consents or approvals are required from any governmental authority or other Person for such Member to enter into this Agreement and all action on the part of such Member necessary for the authorization, execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, have been duly taken.

(c)      The execution and delivery of this Agreement by such Member, and the consummation of the transactions contemplated hereby, does not conflict with or contravene the provisions of such Member's organizational documents, if any, or any agreement or instrument by which such Member or his properties are bound or any law, rule, regulation, order or decree to which such Member or his properties are subject.

15.19   <u>Multiple Counterparts; Facsimile</u>.  This Agreement may be executed in two or more counterparts and by facsimile, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

15.20   <u>Failure of Member to Comply; Remedies Cumulative</u>.  If any Member fails to perform in accordance with, or to comply with the terms and conditions of this Agreement, then the Members acknowledge that the Company and all other Members bound by this Agreement will have no adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of this Agreement or to specifically enforce the provisions thereof without the necessity of posting a bond or proving actual damages. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the Company and all of the Members of the Company have executed this Operating Agreement, effective as of the date written above.

**COMPANY**

EZL 40 Meadow Lane LLC

By: _____
Name: Nir Meir
Title:   Manager

**MANAGER**

_____
Nir Meir

**MEMBERS**

_____
Nir Meir

_____
Ranee A. Bartolacci

Schedule A

MEMBER NAME AND ADDRESS, CAPITAL CONTRIBUTIONS, UNITS AND PERCENTAGE INTEREST

| Member's Name and Address | Capital Contributions | Number of Units | Percentage Interest |
|---|---|---|---|
| Nir Meir<br><br>600 Madison Avenue, 15th Floor, New York, New York  10022 | $5 | 5 | 5% |
| Ranee A. Bartolacci<br><br>600 Madison Avenue, 15th Floor, New York, New York  10022 | $95 | 95 | 95% |
| | | | |
| | | | |
| TOTAL | $100 | 100 | 100.0% |